**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

AGORA FINANCIAL, LLC, et al.,          *

        Plaintiffs,          *

v.          *          **Case No. WDQ-09-1200**

MARTIN SAMLER,          *

        Defendant.          *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**REPORT AND RECOMMENDATION**

    This case has been referred to the undersigned pursuant to 28 U.S.C. § 636 and Local

Rules 301 and 302 to conduct proceedings and submit a report and recommendation regarding

the entry of default judgment and the appropriate amount of damages to be awarded to plaintiffs.

(Paper No. 13.)  For the reasons discussed herein, I respectfully recommend that plaintiffs'

Motion for a Default Judgment (Paper No. 10) be DENIED and no damages be awarded.

**I.  BACKGROUND**

    Plaintiffs Agora Financial, LLC, Oxford Club, LLC, Taipan Publishing Group, LLC,

Stansberry and Associates Investment Research, LLC, and Sovereign Offshore, LLC publish

financial investment newsletters featuring articles written by respected financial analysts

employed by plaintiffs.  (Compl. ¶ 4, Paper No. 1 at 2; Mem. Supp. Pls.' Mot. Def. J., Paper No.

10-2 at 3.)  In these articles, plaintiffs' financial analysts recommend broad investment strategies

as well as specific investments to plaintiffs' readers.  (Id.; The Oxford Club Communiqué, Apr.

1, 2010, Paper No. 16 at 13-25.)  Plaintiffs' publications also contain "portfolios," or lists

summarizing plaintiffs' analysts' recommended investments.  (The Oxford Investment Portfolio,

Paper No. 16 at 26-27.)  These publications are sent to plaintiffs' paid subscribers and are a vital

component of plaintiffs' business.  (Decl. of Julia Cooke Guth, Executive Director, The Oxford Club, LLC, Nov. 17, 2009, Paper No. 10 Attach. 8 at 1-2.)

According to plaintiffs, defendant Martin Samler operates the website Tipstraders.com. (Compl. ¶ 5.)  Without plaintiffs' authorization, defendant posts on his website the investment recommendations contained in plaintiffs' publications and profits from these postings by charging individuals access to his website.  (Id.)  Specifically, one page of defendant's website lists hundreds of financial analysts, including plaintiffs' financial analysts, next to their affiliated financial entities, including plaintiffs.  (Tipstraders.com, List of Tipsters, Paper No. 10 Attach. 3 at 1-5; Guth Decl., Paper No. 10 Attach. 8 at 2.)  By clicking on an analysts' name, the user is directed to a page with a list purporting to represent that analysts' recommended investments. (Paper No. 10 Attach. 3 at 11-18; Guth Decl., Paper No. 10 Attach. 8 at 2-3.)  The page also provides statistical information summarizing the performance of those recommended stocks. (Paper No. 10 Attach. 3 at 11-18.)  For example, after clicking on plaintiff Oxford Club analyst Alexander Green's name, users are directed to a page listing Mr. Green's name at the top of the page, and identifying Oxford Club as his affiliate publisher.  (Paper No. 10 Attach. 3 at 16.) Under this identifying information, Tipstraders.com lists Mr. Green's stock recommendations, statistical information regarding the performance of each stock, and statistical information regarding the overall performance of Mr. Green's recommended stocks.  (Id.)[1]

Defendant's site expressly disclaims any affiliation, endorsement, or sponsorship by or with those analysts whose recommendations it reproduces or those analysts' affiliated financial entities.  (Id. at 11-18.)  For example, Tipstraders.com provides the following disclaimer at the bottom of the page listing Mr. Green's purported recommendations:

---

[1] Plaintiffs note that Tipstraders.com's lists of recommendations do not accurately depict their analysts' recommendations.  (Guth Decl., Paper No. 10 Attach. 8 at 2.)

> Tipstrader.com is in no way affiliated with or endorsed or sponsored by
> Alexander Green or The Oxford Club, nor do we claim to represent the
> performance of their publication.  The picks above are, unless otherwise stated,
> entered by registered members of TipsTraders.com in accordance with our
> general methodology and respecting any proprietary rights.  Analysts are likely to
> have recommended trades not listed here, and at different times of entry.
> Analysts are also likely to offer an exit strategy very different from ours.

(Id. at 16.)[2]

Plaintiffs filed a Complaint in this court on May 8, 2009 asserting two causes of action. (Paper No. 1.)  First, plaintiffs claim that defendant's conduct constitutes a "hot news" misappropriation of their writers' investment recommendations under the doctrine set forth in International News Service v. Associated Press, 248 U.S. 215 (1918).  (Id. ¶¶ 6-9.)  Second, plaintiffs assert that defendant's conduct violates Section 43(a) of the Lanham Act.  (Id. ¶¶ 10-12.)

After defendant failed to file an answer or otherwise defend against plaintiffs' Complaint, plaintiffs filed a Motion for a Default Judgment (Paper No. 10) on November 23, 2009.  On January 5, 2010, the Clerk of this Court entered an Order of Default against defendant Martin Samler for want of answer or other defense.  (Paper No. 12.)  On January 22, 2010, Judge Quarles referred this case to the undersigned to review plaintiffs' Motion for a Default Judgment and to make recommendations regarding the entry of default judgment.  (Paper No. 13.)  In accordance with Federal Rule of Civil Procedure 55(b)(2), the undersigned held a hearing on

---

[2] According to plaintiffs, Tipstraders.com is an "aggregator," or a company that "collect[s] [financial] information from [various] sources and offer[s] it in one place."  (Guth Decl., Paper No. 10 Attach. 8 at 4.)  These "aggregators," according to plaintiffs, "have become common on the internet, and . . . are a threat to the existence of traditional investment publishers like plaintiffs, since customers can circumvent paid subscriptions."  (Id.)  As discussed in detail in a recent opinion by the United States District Court for the Southern District of New York, Barclays Capital, Inc., et al. v. TheFlyOnTheWall.com, No. 06-Civ-4908, 2010 U.S. Dist. LEXIS 25728, at *1-42 (S.D.N.Y. March 18, 2010), there is a "crowded marketplace" of "small internet companies and major news organizations" who post financial analysts' time-sensitive stock recommendations without authorization to do so.

May 4, 2010 in open court.  Plaintiffs' counsel, Michael Geltner, Esquire, attended on behalf of

plaintiffs.  Defendant was served with notice of the hearing (Paper No. 18), but did not attend.  In

addition, prior to and following the May 4th hearing, plaintiffs submitted supplemental briefing in

accordance with the undersigned's direction.  (Paper Nos. 15, 16, 20 & 21.)

## II. <u>STANDARD FOR ENTRY OF DEFAULT JUDGMENT</u>

In reviewing plaintiffs' Motion for a Default Judgment (Paper No. 10), the court accepts

as true the well-pleaded factual allegations in the complaint as to liability.  <u>Ryan v.</u>

<u>Homecomings Fin. Network</u>, 253 F.3d 778, 780-81 (4th Cir. 2001).  It, however, remains for the

court to determine whether these unchallenged factual allegations constitute a legitimate cause of

action.  <u>Id.</u>; <u>see also</u> 10A Wright, Miller & Kane, <u>Federal Practice and Procedure</u> § 2688 (3d ed.

Supp. 2010) ("[L]iability is not deemed established simply because of the default . . . and the

court, in its discretion, may require some proof of the facts that must be established in order to

determine liability.").

If the court determines that liability is established, the court must then determine the

appropriate amount of damages.  <u>Ryan</u>, 253 F.3d at 780-81.  The court does not accept factual

allegations regarding damages as true, but rather must make an independent determination

regarding such allegations.  <u>E.g.</u>, <u>Credit Lyonnais Secs. (USA), Inc. v. Alcantara</u>, 183 F.3d 151,

154 (2d Cir. 1999).  In so doing, the court may conduct an evidentiary hearing.  Fed. R. Civ. P.

55(b)(2).  In addition, with respect to the character of the amount and judgment, Fed. R. Civ. P.

54(c) provides that "[a] default judgment must not differ in kind from, or exceed in amount, what

is demanded in the pleadings."

In sum, the court must (1) determine whether the unchallenged facts in plaintiffs' complaint constitute a legitimate cause of action, and, if they do, (2) make an independent determination regarding the appropriate amount of damages.

## III.   DEFENDANT'S LIABILITY

As noted above, plaintiffs' Complaint sets forth two causes of action: (1) a "hot news" misappropriation claim; and (2) a claim under Section 43(a) of the Lanham Act.  A discussion of each cause of action follows.

### A.   Plaintiffs' "Hot News" Misappropriation Claim

The central issue with respect to plaintiffs' "hot news" misappropriation claim is whether this claim is preempted by federal copyright law.  The "hot news" misappropriation cause of action was first recognized in International News Service v. Associated Press, 248 U.S. 215 (1918) ("INS").  INS involved two competitor news wire services, the Associated Press ("AP") and International News Service ("INS").  248 U.S. 215 (1918).  AP "gather[ed] in all parts of the world, by means of various instrumentalities of its own, by exchange with its member[] [newspapers], news and intelligence of current and recent events of interest to newspaper readers and distribute[d] it daily to its members for publication in their newspapers."  Id. at 229.  INS pirated AP's "news" by, among other means, taking it from bulletins or early editions of AP's publications and selling this news, either wholesale or after rewriting it, to its customers.  Id. at 231-32.  AP filed suit against INS alleging that its conduct constituted unfair competition in business.  Id. at 232.

Before analyzing AP's unfair competition claim, the Supreme Court discussed the relationship between AP's claim and copyright law.  Id. at 234.  While acknowledging that a newspaper "article, as a literary production, is the subject of copyright," the Court rejected the

notion that the copyright in an article extended to the factual information contained therein because "the news element-the information respecting current events contained in the literary production-is not the creation of the writer, but is a report of matters that are ordinarily publici juris; it is the history of the day." Id.

After noting that the Copyright Act does not extend to news itself, the Court turned its attention to whether the doctrine of unfair competition afforded AP's news matter protection. Id. at 234-35 ("We need spend no time, however, upon the general question of property in news matter at common law, or the application of the copyright act, since it seems to us the case must turn upon the question of unfair competition in business."). The Court concluded that it does:

> The right of the purchaser of a single newspaper to spread knowledge of its contents gratuitously, for any legitimate purpose not unreasonably interfering with complainant's right to make merchandise of it, may be admitted; but to transmit that news for commercial use, in competition with complainant – which is what defendant has done and seeks to justify – is a very different matter. In doing this, defendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest of those who have sown. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself and a court of equity ought not to hesitate long in characterizing it as unfair competition in business.

Id. at 239-40.

"Thus, in INS, the misappropriation doctrine was developed to protect costly efforts to gather commercially valuable, time-sensitive information that would otherwise be unprotected by law." Barclays Capital, Inc. v. TheFlyOnTheWall.com, No. 06-cv-4908, 2010 U.S. Dist.

LEXIS 25728, at *58-59 (S.D.N.Y. March 18, 2010) (emphasis added).  This holding was predicated, at least in part, on the "sweat-of-the-brow" doctrine.  Id.   According to this doctrine, intellectual property should be afforded protection because of the hard work or labor that goes in to discovering, gathering, or producing it.  See Feist Publ'n, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 352 (1991) ("Known alternatively as 'sweat of the brow' or 'industrious collection,' the underlying notion was that copyright was a reward for the hard work that went into compiling facts.").

While INS was a pre-Erie case premised upon federal common law and, therefore, is no longer binding precedent in its own right, the INS doctrine was adopted into common law by several states, including Maryland.  See GAI Audio of N.Y., Inc. v. Columbia Broad Sys., Inc., 27 Md. App. 172, 189-93, 340 A.2d 736 (Md. Ct. Spec. App. 1975) (court recognized INS claim as a species of unfair competition under Maryland common law).[3]  In 1976, however, Congress added a new provision to the Copyright Act, Section 301, which explicitly preempts state causes of action if: (1) the state rights are "equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106,"[4] and (2) the work in which state rights are claimed falls "within the subject matter of copyright."  17 U.S.C. § 301.[5]

---

[3] According to the GAI Audio court, "[t]he constituent elements of the 'misappropriation' cause of action postulated in the INS case are (1) time, labor, and money spent in the creation of the thing misappropriated, (2) a competitive relationship between plaintiff and defendant and (3) commercial damage to the plaintiff."  27 Md. App. 172, 190, 340 A.2d 736.

[4] Section 106 "affords a copyright owner the exclusive right to: (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies of the work by sale or otherwise; and, with respect to certain artistic works, (4) perform the work publicly; and (5) display the work publicly."  Rosciszewski v. Arete Assocs., Inc., 1 F.3d 225, 229 (4th Cir. 1993) (internal quotation marks and citation omitted).

[5] The first prong is generally referred to as the "general scope requirement" and the second prong is generally referred to as the "subject matter requirement."  National Basketball Assoc. v. Motorola, Inc., 105 F.3d 841, 848 (2d Cir. 1997).

Nevertheless, the legislative history of the 1976 amendments to the Copyright Act

suggested that Congress did not intend to preempt INS-like "hot news" claims.  Specifically, the

House Report accompanying the amendments provided:

> 'Misappropriation' is not necessarily synonymous with copyright infringement,
> and thus a cause of action labeled as 'misappropriation' is not preempted if it is in
> fact based neither on a right within the general scope of copyright as specified in
> section 106 nor on a right equivalent thereto.  For example, state law should have
> the flexibility to afford a remedy (under tradition principles of equity) against a
> consistent pattern of unauthorized appropriation by a competitor of facts . . . .
> constituting 'hot' news, whether in the traditional mold of [INS] or in the newer
> form of data updates from scientific, business, or financial data bases.

H. Rep. No. 94-1476 at 132 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5665 (emphasis

added).

The next major development in the "hot-news" misappropriation theory was the 1991

Supreme Court decision, Feist Publ'n, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340 (1991).  In

Feist, the Supreme Court recognized that, while compilations of facts, such as telephone

directories, may be subject to copyright protection insofar as the arrangement or selection of

facts reflects creativity, it clarified that facts themselves, such as telephone numbers, are not

subject to protection against copying or distribution under copyright law.[6]  Id.  Explaining "why

facts are not copyrightable," the Court stated:

> The sine quo non of copyright is originality.  To qualify for copyright protection,
> a work must be original to the author. . . . Original, as the term is used in
> copyright, means only that the work was independently created by the author (as
> opposed to copied from other works), and that it possesses at least some minimal
> degree of creativity.

Id. at 345 (citations omitted).

---

[6] The Court ultimately held that plaintiffs' telephone directories were not copyrightable
because they were not selected, coordinated, or arranged in an original way.  Feist, 499 U.S. at
361-64.

While, according to the Court, "[n]o one may claim originality as to facts[,]" . . . [f]actual compilations, on the other hand, may possess the requisite originality" since "[t]he compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers." Id. at 347, 348 (internal quotation marks and citation omitted). The Court, however, cautioned that "[t]his protection is subject to an important limitation," which is that "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected." Id. at 348. Thus, "[n]o matter how much original authorship the work displays, the facts . . . it exposes are free for the taking." Id. at 349 (internal quotation marks and citation omitted). This is because "[t]he primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'" Id. (quoting U.S. Const. Art. I, § 8, cl. 8). "To this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the . . . information conveyed by a work." Id. (citation omitted). "This principle, known as the . . . fact/expression dichotomy, applies to all works of authorship." Id.

Accordingly, the Feist Court explicitly repudiated the notion, espoused by some courts, that facts can be accorded copyright protection based on the "sweat-of-the-brow" theory. See id. at 359-60 ("[T]he 1976 revisions to the Copyright Act leave no doubt that originality, not 'sweat of the brow,' is the touchstone of copyright protection in directories and other fact-based works."). In so doing, the Court cited the INS court's "flat[] reject[ion] . . . [of] the notion that the copyright in an article extended to the factual information it contained" as the "best example" of a Supreme Court decision rejecting the application of the "sweat-of-the-brow" theory to copyright law. Id. at 353-54.

Nonetheless, according to the Court, while "the 'sweat of the brow' doctrine flout[s] basic copyright principles[,]" it maintained that "[p]rotection for the fruits of [factual] research . . . may in certain circumstances be available under a theory of unfair competition." Id. at 354.  The Court also expressly noted that it was not overturning INS.  See id. at 354 at n.* ("The Court [in INS] ultimately rendered judgment for Associated Press on noncopyright grounds that are not relevant here.").  In sum, Feist: (1) held that a work must be "original," i.e., "possess at least some minimal degree of creativity" to qualify for copyright protection; and (2) suggested that the essence of the INS doctrine, i.e., that non-original works, such as news matter, may be afforded protection "under a theory of unfair competition," remains intact.  Id. at 345-54.

The question of whether a hot-news misappropriation claim survives federal preemption after the 1976 amendments to the Copyright Act and Feist was addressed by the Second Circuit in National Basketball Assoc. v. Motorola, Inc., 105 F.3d 841 (2d Cir. 1997) ("NBA").  In that case, plaintiff NBA brought a misappropriation claim against defendants Motorola, a manufacturer and promoter of hand-held pagers that provided real-time information about NBA games, and Sports Team Analysis and Tracking Systems ("STATS"), the supplier of the game information transmitted to the Motorola pagers.  Id.  Specifically, Motorola provided the following factual information via its pager device about NBA games in progress: "(i) the teams playing; (ii) score changes; (iii) the team in possession of the ball; (iv) whether the team is in the free-throw bonus; (v) the quarter of the game; and (vi) time remaining in the quarter."  Id. at 844.

NBA's complaint asserted, inter alia, a copyright infringement claim and a "hot news" misappropriation claim.  Id. at 844.  The district court rejected NBA's copyright infringement claims with respect to both the underlying basketball games and NBA's broadcasts of these games.  Id.  Although NBA did not appeal this part of the district court's decision, the Second

Circuit analyzed NBA's copyright infringement claims because "discussion of the infringement claims [was] necessary to provide the framework for analyzing the viability of the NBA's state law misappropriation claim in light of the Copyright Act's preemptive effect." Id. at 845.  First, the court rejected NBA's claim that it could copyright the basketball games themselves because, according to the court, sporting events "do not constitute 'original works of authorship' under 17 U.S.C. § 102(a)," and, therefore, "do not fall within the subject matter of federal copyright protection." Id. at 846-47.  With respect to the broadcasts, the court cited the "'fact/expression dichotomy'" discussed in Feist and held that, "[a]lthough the broadcasts are protected under copyright law, . . . Motorola and STATS did not infringe NBA's copyright because they reproduced only facts from broadcasts, not the expression or description of the game that constitutes the broadcast." Id. at 847 (quoting Feist, 499 U.S. at 350).

After concluding that the material at issue, the scores and statistics of NBA games, were not copyrightable, the court analyzed whether that factual information could be protected under a state-law misappropriation claim. Id. at 847-53.  Since NBA's claim was predicated on the "hot news" misappropriation theory set forth in INS, the court analyzed whether, and to what extent, such claims survive federal preemption after the 1976 amendments to the Copyright Act. Id. Citing the passage of the House Report that accompanied Section 301, the court first concluded that the "hot news" exception should be analyzed as an exception to the general scope prong rather than the subject matter prong. Id. at 850.[7]  Thus, the court analyzed whether a "hot news"

---

[7] The district court in NBA concluded that NBA's misappropriation claim was not preempted by the Copyright Act "because, with respect to the underlying games, as opposed to the broadcasts, the subject matter requirement was not met" since sporting events themselves are uncopyrightable. Id. at 848.  Applying what it "dubbed . . . partial preemption," the district court separately analyzed NBA's misappropriation claims relating to the underlying games and misappropriation claims relating to broadcasts of those games. Id.  On appeal, the Second Circuit rejected the district court's "partial preemption" analysis. Id. at 848-49.  According to

claim could fall outside the general scope prong pursuant to the following standard, which had

been set forth in an earlier Second Circuit case: "[I]f an 'extra element' is 'required instead of or

in addition to the acts of reproduction, performance, distribution or display, in order to constitute

a state-created cause of action, then the right does not lie 'within the general scope of copyright,'

and there is no preemption."  Id. at 850 (quoting Computer Assoc. Int'l, Inc. v. Altai, Inc., 982

F.2d 693, 716 (2d Cir. 1992)).  In discussing this standard, the NBA court noted that "the 'extra

element' test should not be applied so as to allow state claims to survive preemption easily."  Id.

at 851 (citing Computer Assoc. Int'l, 982 F.2d at 717).

> According to the NBA court, the "elements central to an INS claim" are:
>
> (i) the plaintiff generates or gathers information at some cost or expense . . . ; (ii)
> the value of the information is highly time-sensitive. . . ; (iii) the defendant's use
> of the information constitutes free-riding on the plaintiff's costly efforts to
> generate or collect it . . . ; (iv) the defendant's use of the information is in direct
> competition with a product or service offered by the plaintiff . . . ; and (v) the
> ability of other parties to free-ride on the efforts of the plaintiff or others would so
> reduce the incentive to produce the product or service that its existence or quality
> would be substantially threatened . . . .

Id. at 853.  The court held that the "extra elements-those in addition to the elements of copyright

infringement-that allow a 'hotnews' claim to survive preemption are: (i) the time-sensitive value

of factual information; (ii) the free-riding by a defendant, and (iii) the threat to the very existence

of the product or service provided by the plaintiff."  Id. (emphasis added).  Thus, the NBA court

appeared to conclude that there are five elements "central to an INS claim," three of those

elements are distinct from a copyright infringement claim, and those three distinct elements

provide the requisite "extra elements" that, if present, allow a "hot news" claim to survive

---

the Second Circuit, "[a]lthough game broadcasts are copyrightable while the underlying games
are not, the Copyright Act should not be read to distinguish between the two when analyzing the
preemption of a misappropriation claim based on copying or taking from the copyrightable
work."  Id. (citing ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1453 (7th Cir. 1996)).

preemption.[8]  While the court's five-element test did not expressly limit the "hot news"

misappropriation theory to the protection of "factual information," the court's three-element test

did.

Although the NBA test has been cited with approval and adopted outside the Second

Circuit,[9] the Fourth Circuit has never applied or discussed it.  This court, however, has expressly

rejected its application in a case that was similar to the instant case.  Specifically, in Lowry's

Reports, Inc. v. Legg Mason, Inc., 271 F. Supp. 2d 737, 754 (D. Md. 2003), Judge Quarles

considered whether plaintiff Lowry's Reports ("Lowry's") "hot news" misappropriation claim

was preempted by federal copyright law.  Lowry's argued "that the elements of a 'hot news'

claim under Maryland law match the elements of such a claim under New York law," as

articulated in NBA.  Id. at 755.  Judge Quarles, however, rejected the NBA test.  Id. at 755-56.

While noting that "[s]ome 'hot news' claims may yet survive" preemption, Judge Quarles held

that none of the "extra elements" of the NBA test constitute an "act" that is "distinguishable"

from "the right to reproduce, perform, distribute or display a work," i.e., the rights protected

under Section 106 of the Copyright Act.  Id.  Specifically, the court noted:

---

[8] The three-element test cited in the text above is from the analysis section of the opinion.
105 F.3d at 853.  In another part of its opinion, the "Summary of Ruling" section, the NBA court
articulated the five-element test set forth in the text above as its holding for determining whether
"hot news" misappropriation claims are preempted.  Id. at 845.  At least one court applying the
NBA test has articulated it as a three-element test.  Scranton Times, L.P. v. Wilkes-Barre Publ'g
Co., No. 3:08-cv-2135, 2009 U.S. Dist. LEXIS 17278 (M.D. Pa. Mar. 6, 2009).  All other courts,
however, articulate the test as including five elements.  E.g., Barclays Capital, 2010 U.S. Dist.
LEXIS 25728, at *65-91; Lowry's Reports, Inc. v. Legg Mason, Inc., 271 F. Supp. 2d 737, 755
(D. Md. 2003).

[9] See ConFold Pac., Inc. v. Polaris Indus., Inc., 433 F.3d 952, 960 (7th Cir. 2006) (citing
NBA's hot-news formulation with approval); Scranton Times, 2009 U.S. Dist. LEXIS 17278, at
* 11 (applying NBA test); X17, Inc. v. Lavandeira, 563 F. Supp. 2d 1102, 1104-06 (C.D. Cal.
2007) (applying NBA test); Pollstar v. Gigmania Ltd., 170 F. Supp. 2d 974 (E.D. Cal. 2000)
(same); Fred Wehrenberg Circuit of Theatres, Inc. v. Moviefone, Inc., 73 F. Supp. 2d 1044,
1049-50 (E.D. Mo. 1999) (same).

> Free-riding . . . may be a pejorative description of copying, but it is still copying. . . . The other elements do not describe behavior at all.  The cost of generating the information, its time-sensitivity, and direct competition between the parties merely define pre-existing conditions, the threat to the plaintiff's business merely identifies a consequence of the act of 'free-riding.'

Id. (citing Jane C. Ginsburg, Copyright, Common Law, and Sui Generis Protection of Databases in the United States and Abroad, 66 U. Cin. L. Rev. 151, 162 (1997); Nicholas Khadder, Note, Nat'l Basketball Ass'n v. Motorola, Inc., 13 Berkeley Tech. L.J. 3, 14-15 (1998)).  Accordingly, the Lowry's court held that the NBA test does not "add[] or substitute[] 'an extra element that changes the nature of the state law action so that it is qualitatively different from a copyright infringement claim'" and, therefore, the "hot news" misappropriation claim as articulated by the NBA court does not fall outside the "general scope requirement" of Section 301.  Id. at 754-56 (quoting United States ex rel. Berge v. Bd. Of Trs., 104 F.3d 1453, 1463 (4th Cir. 1997)) (emphasis in original).

Notwithstanding the Lowry's court's rejection of the NBA test, plaintiffs expressly base their "hot news" misappropriation claim on this test.  According to plaintiffs' Complaint:

> Each plaintiff generated and collected the information at some significant costs and expense, the value of the information in the Portfolios is highly time-sensitive, defendant's use of the information constitutes 'free-riding' on each plaintiff's costly efforts to generate and collect it, defendant is using the information contained in the Portfolios in direct competition with plaintiffs' offering of the Portfolios to subscribers, by making it available to them in lieu of subscription to plaintiffs' publications, and the ability of others to free ride on the efforts of plaintiffs would so reduce the incentive of plaintiffs to produce the product or services that the existence of the Portfolios or their quality would be substantially threatened . . . .

(Compl. ¶ 6.)

Plaintiffs address the Lowry's court's treatment of NBA in their motion for default judgment by contending that the Lowry's court merely expressed "skeptic[ism] of the breadth of the NBA formulation."  (Paper No. 10-2 at 5.)  Accordingly, plaintiffs attempt to distinguish

their case on factual grounds by arguing that defendant Samler's conduct invokes two elements of the <u>NBA</u> test that were not present in <u>Lowry's</u>: (1) that Samler "directly competes" with a product or service offered by plaintiff;" and (2) that Samler's "free-riding" on plaintiffs' efforts will so reduce plaintiff's incentive to produce its product that its existence or quality is "substantially threatened."  (<u>Id.</u> at 6.)  Plaintiffs' argument is unpersuasive, however, because the <u>Lowry's</u> court did not express "skepticism" of the <u>NBA</u> test; it expressly rejected this test.  Thus, plaintiffs' attempt to distinguish their case from <u>Lowry's</u> fails because the <u>Lowry's</u> court would have rejected Lowry's claim even if Lowry's had established that the "direct competition" and "substantial threat" elements were present.

In any event, even if the court were to apply the <u>NBA</u> test, plaintiffs' claim would still fail since plaintiffs have not set forth factual allegations in their Complaint or any proof in their subsequent filings from which the court could conclude that the material at issue in this case is "factual information."  Instead, this material appears to be "original" works, which are copyrightable and, therefore, not subject to protection under the <u>NBA</u> court's formulation of the <u>INS</u> doctrine.

As discussed above, Section 301 of the Copyright Act preempts state causes of action if: (1) the state rights are "equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106"' <u>and</u> (2) the work in which state rights are claimed falls "within the subject matter of copyright." According to the <u>NBA</u> court, the first prong, or the "general scope requirement" prong, is the applicable prong for analyzing whether "hot news" misappropriation claims are preempted.  105 F.3d at 850.

Copyright law protects material because of its "originality" since the "originality" of work "'promote[s] the Progress of Science and useful Arts.'"  <u>Feist</u>, 499 U.S. at 349 (quoting

Art. I, § 8, cl. 8).  Accordingly, copyright law provides an exclusive right to individuals to reproduce, distribute, perform, or display their "original" work, which, in turn, "encourag[es] the creation of writings by authors."  Id. at 354 (internal quotation marks and citation omitted).  The "hot news" misappropriation theory, on the other hand, "protects costly efforts to gather commercially valuable, time-sensitive information that would otherwise be unprotected by law" because of the "labor" expended in gathering that information.  Barclays Capital, 2010 U.S. LEXIS 25718, at *58-59.  Accordingly, this cause of action provides an exclusive right to individuals to profit or otherwise benefit from the "labor" they expend in gathering such information.  The distinction, therefore, between the rights protected under a copyright infringement claim and a "hot news" misappropriation claim is that copyright law protects a copyright holder's exclusive right to reproduce, distribute, perform, or display "original" material while the "hot news" misappropriation theory protects an individual's exclusive right to profit or otherwise benefit from the labor expended in discovering, gathering, and generating certain "non-original" material, such as factual information.

The conclusion that "hot news" misappropriation claims are limited to claims in which the material at issue is factual information or material that is otherwise not protectable under the Copyright Act is consistent with INS, the text of the House Report that accompanied Section 301, and Feist.  Specifically, in INS, the Supreme Court held that "news matter," information that could not be protected by copyright law because it is factual, could be protected under a misappropriation theory.  248 U.S. at 239-40.  The House Report accompanying Section 301, which is often cited as authority for the position that Congress did not preempt "hot news" misappropriation claims, provided that "state law should have the flexibility to afford a remedy . . . against a consistent pattern of unauthorized appropriation of facts . . . constituting "hot news.""

H. Rep. No. 94-1476 at 132 (emphasis added).  In <u>Feist</u>, the Supreme Court reaffirmed that copyright law only protects "original" material, but noted that "[p]rotection for the fruits of [factual] research . . . may in certain circumstances be available under a theory of unfair competition."  499 U.S. at 354.

This conclusion is also consistent with <u>NBA</u>.  In <u>NBA</u>, the Second Circuit first determined that the material at issue in that case, scores and statistical information of NBA games, was not copyrightable because it was factual information.  105 F.3d at 847 (citing <u>Feist</u>, 499 U.S. at 350).  After providing this "framework for analyzing the viability of the NBA's state law misappropriation claim in light of the Copyright Act's preemptive effect," the court concluded that certain "narrow 'hot-news' misappropriation claim[s] survive[] preemption . . . ." <u>Id.</u> at 852.  As noted, the court, in one part of its opinion, set forth a five-element test for determining when such claims survive preemption, <u>id.</u> at 845, and, in another part of the opinion, set forth a three-element test for resolving this issue.  <u>Id.</u> at  853.  While the five-element test does not expressly limit the "hot news" misappropriation theory to protecting "factual information," the three-element test does.  <u>See</u> <u>id.</u> at 853 (first element of test is "time sensitive value of factual information").  Accordingly, in light of this express language in the court's three-element test, the fact that the material at issue in <u>NBA</u> was factual information, and the court's repeated insistence that it was articulating a "narrow 'hot news' misappropriation claim,"[10] this court concludes that the <u>NBA</u> court held that the material at issue must be "factual information" in order for such material to form the basis of a "hot news" misappropriation claim.

This reading of <u>NBA</u> is supported by the fact that most courts applying the <u>NBA</u> test have only applied it where the material at issue was "factual," and, therefore, not copyrightable.

_____

[10] If the <u>NBA</u> test is read to apply to "original" works, it would expand the scope of the cause of action articulated by the Court in <u>INS</u>.

See Scranton Times, L.P. v. Wilkes-Barre Publ'g Co.,  No. 3:08-cv-2135, 2009 U.S. Dist. LEXIS 17278 (M.D. Pa. Mar. 6, 2009) (facts from plaintiff's obituaries); Pollstar v. Gigmania Ltd., 170 F. Supp. 2d 974 (E.D. Cal. 2000) (time-sensitive concert information); Fred Wehrenberg Circuit of Theatres, Inc. v. Moviefone, Inc., 73 F. Supp. 2d 1044, 1049-50 (E.D. Mo. 1999) (plaintiff's theaters' movie listings); see also Lowry's, 271 F. Supp. 2d at 754-56 (discussing test with respect to Lowry's "numbers," figures representing market "buying power," "selling power," and "short-term buying power," which, according to the parties, were uncopyrightable facts).  But see Barclays Capital, Inc., et al. v. TheFlyOnTheWall.com, No. 06-cv-4908, 2010 U.S. Dist. LEXIS 25728, at *8-12, 67-91 (S.D.N.Y. March 18, 2010) (stock investment recommendations, which entailed "original equity research," requiring plaintiffs' analysts to "draw conclusions" and "exercise judgment in determining when to initiate or terminate research coverage of a particular company . . . and when to change the rating, target price, or other investment advice for a given security," protectable under "hot news" misappropriation theory); X17, Inc. v. Lavandeira, 563 F. Supp. 2d 1102, 1104-06 (C.D. Cal. 2007) (copyrighted photographs protectable under "hot news" misappropriation theory).

In light of this conclusion, the court must determine whether the material at issue in the instant suit, plaintiffs' investment recommendations, constitute "factual information."  Since plaintiffs' Complaint does not allege that this material is "factual information," the undersigned directed plaintiffs to provide supplemental briefing on this issue.  (Paper No. 15.)  In addition, this issue was discussed at length at the May 4th hearing.

Plaintiffs argue that, while their investment newsletters are copyrightable factual compilations under Feist, the recommendations contained within the newsletters are uncopyrightable facts.  (Paper No. 16 at 2-3.)  Specifically, according to plaintiffs, while "[t]he

textual explanations made by the author, the ordering of the presentation, the formatting and

overall structure would all be protectable under <u>Feist</u>[,] . . . none of this is contained in

defendant's publication."  (Paper No. 16 at 3.)  Instead, "[d]efendant extracts only the 'facts'

[i.e., the recommendations] and publishes them."  (<u>Id.</u> (alteration in original).)  "The actual

securities buy or sell recommendations in plaintiffs' publications are . . . uncopyright-protectible

'facts.'"  (<u>Id.</u> at 2-3.)

      This argument fails because a recommendation to invest in a company is not a fact, but

instead an "original" work, which, in plaintiffs' case, entails "judgment" and "creativity."  <u>See,</u>

<u>e.g.</u>, <u>Feist</u>, 499 U.S. at 345 ("Original, as the term is used in copyright, means only that the work

was independently created by the author (as opposed to copied from other works), and that it

possesses at least some minimal degree of creativity."); <u>CCC Information Services, Inc. v.</u>

<u>Maclean Hunter Market Reports, Inc.</u>, 44 F.3d 61, 63-67 (2d Cir. 1994) (editors exercised

"judgment and expertise" in valuing used cars and, therefore, their selection and arrangement of

valuation figures in Red Book "displayed amply sufficient originality to pass the low threshold

requirement to earn copyright protection").

      According to Julia Cooke Guth, plaintiff Oxford Club's Executive Director:

> Oxford's investment writers are highly accomplished professionals and are highly
> compensated by Oxford. . . . Each [writer] spends full time involved in research
> related to preparing and writing about investment portfolios. . . . Oxford also
> employs assistants to provide background and related information used by the
> writers. . . .

(Guth Decl., Paper No. 10 Attach. 8 at 5.)  Thus, plaintiffs employ their writers to exercise their

professional judgment in recommending investments and, upon review of plaintiffs' filings and

publications, it is clear that plaintiffs' writers do so.  (<u>See, e.g.</u>, Alexander Green, The Oxford

Club Communiqué, Apr. 1, 2010, Paper No. 16 at 15 (analyzing performance of a specific

information technology company and recommending that Oxford Club's readers invest in that company).)

The conclusion that plaintiffs' writers' investment recommendations are copyrightable is amply supported by comparing cases in which courts found material to be copyrightable with cases in which courts found material to be uncopyrightable.  Compare Feist, 499 U.S. at 361 (names, towns, and telephone numbers of telephone company's subscribers are uncopyrightable facts); Financial Information, Inc. v. Moody's Investors Service, Inc., 808 F.2d 204, 205 (2d Cir. 1986) (index cards listing bonds that have been redeemed and raw data regarding those bonds, such as name of issuer, description of issue, redemption price, date, agent and serial number of bonds being redeemed, are uncopyrightable facts) with CCC Information Services, 44 F.3d at 63 (used car valuations based on "editors' . . . professional judgment" are sufficiently original and, therefore, copyrightable); Eckes v. Card Prices Update, 736 F.2d 859, 862-63 (2d Cir. 1984) ("selection, creativity and judgment in choosing among the 18,000 or so different baseball cards in order to determine which were the 5,000 premium cards" constituted sufficient originality to make list copyrightable); Dow Jones & Co. v. Board of Trade, 546 F. Supp. 113, 116 (S.D.N.Y. 1982) (lists of stock market indexes are copyrightable where company "chose an arbitrary number of components for each of its indexes, decided to select blue-chip stocks representing a variety of business endeavors, and has continually monitored and revised the lists in response to changing economic circumstances").

Accordingly, plaintiffs are seeking to protect an exclusive right to reproduce, distribute, and display their "original" work, i.e., their investment recommendations, and, in turn, protect their writers' "selectivity," "creativity," and "originality."  They are not seeking to protect an exclusive right to profit or otherwise benefit from the labor they expend in generating, gathering,

20

and compiling the "factual information" underlying those recommendations, e.g., the daily performance of one of plaintiffs' analysts' recommended stocks.  Such an argument would clearly fail since plaintiffs could not seriously argue that they have the exclusive right to publish statistical information regarding the daily performance of a particular stock.  While plaintiffs may be able to protect their "original" investment recommendations under federal copyright law, they cannot protect these recommendations under the "hot news" misappropriation theory.[11]

In sum, I cannot find that the unchallenged factual allegations in plaintiffs' Complaint constitute a legitimate cause of action for "hot news" misappropriation and, accordingly, recommend that the court deny plaintiff's motion for default judgment with respect to this claim.

## B.  Section 43(a) of the Lanham Act

Plaintiffs also assert a claim under Section 43(a) of the Lanham Act.[12]  As relevant to this suit, Section 43(a) prohibits the use of any:

> word, term, name, symbol, or device or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact . . . likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship or approval of [one's] goods or services, or commercial activities . . .

15 U.S.C. § 1125(a)(1).

"Section 43(a) is a broad federal unfair competition provision which protects unregistered trademarks similar to the way section 32(1) of the Lanham Act, 15 U.S.C. 1114(1),

---

[11] During the May 4th hearing, plaintiffs' counsel stated that plaintiffs have at times copyrighted their investment publications.  Indeed, plaintiffs Agora Financial, LLC and The Taipan Group, LLC obtained an injunction against another aggregator in 2007 for that aggregator's infringement of their copyrights in their investment publications.  Agora Financial, LLC, et al. v. Kenneth Marsh, et al., 07-cv-0097 (E.D.N.Y. Feb. 23, 2007).  Plaintiffs, however, claim that they have not obtained copyrights in the material at issue in this suit because this material is uncopyrightable factual information.

[12] Section 43(a) of the Lanham Act is codified at 15 U.S.C. § 1125(a).

protects registered marks."  Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002);

see also Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28-29 (2003) ("While

much of the Lanham Act addresses the registration, use, and infringement of trademarks and

related marks, 15 U.S.C. § 1125(a) is one of the few provisions that goes beyond trademark

protection.").  "Its purpose is to prevent consumer confusion regarding a product's source or

sponsorship."  Chambers, 282 F.3d at 155.  "Where there is a claim of consumer confusion with

regard to the association of a product or service with another person's trademark, the central

inquiry is whether it is likely that an appreciable number of ordinarily prudent purchasers will be

misled as to the source or sponsorship of the product or service in question."  Id. (internal

quotation marks and citation omitted); see also George & Co. LLC v. Imagination Entertainment

Ltd., 575 F.3d 383, 393 (4th Cir. 2009) ("A likelihood of confusion exists if the defendant's

actual practice is likely to produce confusion in the minds of consumers about the origin of the

goods or services in question." (internal quotations marks and citation omitted)).

   According to plaintiffs' Motion for a Default Judgment, defendant's website violates

Section 43(a) because "[i]t is readily apparent from viewing the TipsTraders.com website that

nothing is done to tell readers it is a pirate, and any potential subscriber is likely to think that

TipsTraders.com's possession of the portfolios is authorized, or it is somehow affiliated,

connected, approved or sponsored by the producers of the portfolios, exactly as alleged and

banned by the statute."  (Paper No. 10-2 at 7.)  As an initial matter, plaintiffs' Complaint

contains only minimal discussion of their Section 43(a) claim, as it instead primarily focuses on

plaintiffs' misappropriation claim.  Indeed, the only factual allegations that arguably pertain to

their Section 43(a) claim are that defendant (1) copies plaintiffs' portfolios onto his website, and

(2) "holds himself out as a legitimate source for the Portfolios."  (Compl. ¶ 5.)  Otherwise,

plaintiffs' Complaint simply offers a conclusory recitation of the statute.  (Compl. ¶ 10.)  Thus, it is unclear from plaintiffs' Complaint whether defendant's conduct constitutes a Section 43(a) violation.

It, however, is clear from plaintiffs' supplemental filings that defendant's conduct does not violate Section 43(a).  As noted in Part I above, defendant's website provides that "Tipstrader.com is no way affiliated with or endorsed or sponsored by [plaintiffs' writers] or [plaintiffs], nor do[es] [Tipstraders.com] claim to represent the performance of their publication."  (Paper No. 10 Attach. 3 at 11-18.)  Despite this disclaimer, plaintiffs claim that defendant's website confuses consumers about whether it is affiliated with plaintiffs because the "boilerplate, tiny print disclaimer in defendant's text is useless in light of the online publication's presentation of itself as an alternative source for the contents of portfolios prepared by the writers on its list."  (Pls.' Post-Hearing Supp. Mem. Supp. Mot. Def. J., Paper No. 21 at 3.)  Accordingly, plaintiffs request an injunction enjoining defendant from publishing its writers' recommendations without the following disclaimer in bold letters:

> Tipstraders is not authorized by [the plaintiffs' writers] or their publishers, and, in fact have requested Tipstraders to cease and desist from publishing their recommendations.  Moreover, Tipstraders has not obtained those recommendations with the consent of either, and any listed recommendations may contain errors.

(Id. (alteration in original).)

The court rejects plaintiffs' argument because the disclaimer on defendant's website satisfies "the central inquiry" of a Section 43(a) confusion of "affiliation" or "sponsorship" claim, i.e., that an "appreciable number of ordinarily prudent purchasers" will not "be misled as to the source or sponsorship of the product or service in question."  Chambers, 282 F.3d at 155.  Indeed, the language on defendant's website is arguably clearer than plaintiffs' proposed

language disclaiming affiliation with plaintiffs.  The rest of plaintiffs' proposed language, i.e., that plaintiffs have issued a cease and desist letter and some of the recommendations may be wrong, goes beyond the scope of defendant's alleged violation of Section 43(a), which is that defendant's conduct confuses consumers as to whether plaintiffs and defendant are affiliated, and, therefore, goes beyond the scope of any relief the court may order.  See Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207, 217 (4th Cir. 1993) ("Although injunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation.").  Finally, with respect to plaintiffs' argument that the text is "tiny," the court notes that the text of defendant's disclaimer is not appreciably smaller than the rest of the text on defendant's website.

Accordingly, I cannot find that plaintiffs' unchallenged factual allegations constitute a legitimate cause of action under Section 43(a) of the Lanham Act and, therefore, recommend that the court deny this claim as well.

## IV.  CONCLUSION

For the reasons discussed above, I recommend that the court DENY plaintiffs' Motion for a Default Judgment (Paper No. 10).

Any objections to this Report and Recommendation must be served and filed within fourteen (14) days, pursuant to Fed. R. Civ. P. 72(b) and Local Rule 301.5.b.


Date:  _06-17-10_____                    _____/s/_____
                                                  Beth P. Gesner
                                                  United States Magistrate Judge